**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** ———————————————— **IN RE:  ECONAZOLE CASES** ———————————————— **THIS DOCUMENT RELATES TO:** *ALL END-PAYER ACTIONS* ———————————————— | **MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE** **LEAD CASE: 16-EC-27240** **END-PAYER CASE: 16-EC-27242** |

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT 37 HEALTH & SECURITY PLAN;

THE CITY OF PROVIDENCE, RHODE ISLAND;

DETECTIVES ENDOWMENT ASSOCIATION OF THE CITY OF NEW YORK;

LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.;

SELF-INSURED SCHOOLS OF CALIFORNIA;

SERGEANTS BENEVOLENT ASSOCIATION OF THE POLICE DEPARTMENT OF THE CITY OF NEW YORK HEALTH AND WELFARE FUND;

UNITED FOOD & COMMERCIAL WORKERS AND EMPLOYERS ARIZONA HEALTH AND WELFARE TRUST; and

UNITE HERE HEALTH, on behalf of themselves and all others similarly situated,

              Plaintiffs,

    v.

PERRIGO NEW YORK, INC.;

TARO PHARMACEUTICALS U.S.A., INC.; and

TELIGENT, INC.,

              Defendants.

**JURY TRIAL DEMANDED**

**CONSOLIDATED SECOND AMENDED END-PAYER CLASS ACTION COMPLAINT**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ........................................................................... 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS............................. 6

III.    JURISDICTION AND VENUE ................................................................... 10

IV.     PLAINTIFFS ............................................................................................... 12

V.      DEFENDANTS ........................................................................................... 18

VI.     CO-CONSPIRATORS.................................................................................. 19

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE .............. 19

VIII.   BACKGROUND ON GENERIC DRUG INDUSTRY .................................. 20

        A.      Generic Drugs Are Commodity Products ............................................. 20

        B.      Pricing in the U.S. Prescription Drug Industry ................................... 23

IX.     THE GENERIC ECONAZOLE CONSPIRACY ......................................... 25

        A.      Congressional Responses to Generic Drug Price Increases.................. 25

        B.      The Generic Econazole Market ........................................................... 27

        C.      Generic Econazole Price Increases ...................................................... 28

        D.      Defendants Praised the Lack of Competition and Resulting
                Supracompetitive Profits in the Generic Econazole Market................. 52

        E.      Defendants' Conspiracy....................................................................... 56

        F.      Factors Increasing the Market's Susceptibility to Collusion ............... 69

                1.      Industry Concentration................................................... 69

                2.      Barriers to Entry............................................................ 70

                3.      Demand Inelasticity ....................................................... 71

                4.      Lack of Substitutes......................................................... 72

                5.      Standardized Product with High Degree of Interchangeability ............... 72

i

## TABLE OF CONTENTS

**Page**

      6.      Inter-competitor Contacts and Communications ...................................... 73

X.    THE STATUTES OF LIMITATION DO NOT BAR PLAINTIFFS' CLAIMS ............ 82

    A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy ......................... 82

    B.    Fraudulent Concealment Tolled the Statutes of Limitation ................................. 84

        1.    Active Concealment of the Conspiracy .................................... 85

        2.    Plaintiffs Exercised Reasonable Diligence ............................... 87

XI.    CONTINUING VIOLATIONS ........................................................................ 88

XII.    DEFENDANTS' ANTITRUST VIOLATIONS ................................................... 88

XIII.    CLASS ACTION ALLEGATIONS ................................................................ 90

XIV.    CAUSES OF ACTION ................................................................................. 94

    FIRST COUNT: Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Class) ................................................................. 94

    SECOND COUNT: Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class) ................................................................................ 96

    THIRD COUNT: Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class) .................................................................. 118

    FOURTH COUNT: Unjust Enrichment (on behalf of Plaintiffs and the Damages Class) .......................................................................................................... 154

XV.    PRAYER FOR RELIEF ............................................................................. 178

XVI.    JURY DEMAND ...................................................................................... 180

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.     NATURE OF THE ACTION

1.     This suit brings claims on behalf of End-Payer Purchasers ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic econazole nitrate 1% cream (15, 30, or 85gm) ("Econazole").

2.     Econazole is a topical antifungal cream used to treat a variety of inflammatory skin infections, including tinea pedis (athlete's foot), tinea cruris, tinea corporis (ringworm), and cutaneous candidiasis, as well as tinea versicolor.  It has been marketed in the United States for more than 30 years.  The United States Food and Drug Administration ("FDA") first approved econazole nitrate cream in 1982 under the brand name Spectazole, which has since been discontinued.  Generic econazole creams have been approved and available for well over a decade.

3.     For years, competition among sellers of generic Econazole kept prices stable, at low levels.  But starting at least as early as July 2014, Defendants, who dominate the market for Econazole, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented—Defendants caused the price of generic Econazole products to dramatically and inexplicably increase as much as ███ higher than June 2014 prices, as alleged in Section IX.C herein, and generic Econazole prices remain at elevated levels today.  In fact, the U.S. Government Accountability Office ("GAO") identified Econazole as having experienced "an extraordinary price increase."[1]

---

[1] GAO, GAO-16-706, Report to Congressional Requesters, Generic Drugs Under Medicare at Appx. III (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

4.      Defendants' unlawful and anticompetitive conduct in the Econazole market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.      The price increases imposed by Defendant manufacturers of generic Econazole cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.   Instead, the significant increases in the prices of Econazole were the result of an illegal agreement among Defendants to fix prices.

6.      The market for Econazole was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because Econazole is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Econazole products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.  They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

7.      Because purchasers choose whose Econazole product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

8.      Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Econazole prices and allocate markets and customers

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for Econazole. As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance) ("HDA"), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

9.     Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Econazole—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.   But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

11.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[3] Intervenor United States' Motion to Stay Discovery at 1–2 (May 1, 2017), ECF No. 279.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

companies.  Way beyond. . . .  We're learning new things every day."[4]  There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

(a)     Currently, the Connecticut AG and the Attorneys' General of 48 additional jurisdictions (together, "States") are pursuing claims against 20 defendants alleging collusion that distorted the prices of at least 15 generic drugs.[6]  But the States' investigation is ongoing, and they have indicated that additional manufacturers and hundreds of additional generic drugs are implicated in widespread anticompetitive conduct.

(b)     In a competitive marketplace, each generic drug manufacturer should price its drug competitively relative to other manufacturers. Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices. But, as uncovered by the States, the market for generic drugs has not been characterized by such competition for many years.

(c)     The States have exposed a marketplace in which generic drug manufacturers communicated with each other to determine and agree on the amount of market share each "competitor" would be allocated. These shares were determined by the

---

[4] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016), *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

[5] Press Release, Conn. AG, *Conn. Leads 20 State Coal. Filing Fed. Antitrust Lawsuit against Heritage Pharm., other Generic Drug Cos.* (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[6] *See* Plaintiff States' Consolidated Amended Complaint, Civ. No. 17-3768, MDL 2724, Dkt. No. 14, (June 18, 2018) ("State AG Complaint").

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

timing of each manufacturer's entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

(d)    The purpose of the unlawful "fair share" allocation was to fix, maintain and stabilize prices—either for a particular generic drug or any number of generic drugs. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug. Manufacturers implemented the "fair share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful.  This prevented prices from declining even when a new "competitor" joined the market.

(e)    Additionally, in conjunction with their market allocation agreement, manufacturers also agreed to raise prices above competitive levels for certain drugs, and were able to maintain or slow the decline of prices for other drugs that would have been lower absent their conspiratorial agreements.

(f)    As alleged in more detail below, Defendants Perrigo, Taro and Teligent reached a "fair share" and price-fixing agreement relating to, at least, Econazole.

12.    Manufacturers of generic Econazole are implicated in the ongoing State and federal investigations; at least two of the Defendants named here, including Perrigo and Taro, have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.  Sun Pharmaceutical Industries, Inc., which owns a majority stake in Taro, also received a grand jury subpoena as part of DOJ's generics probe.

5

13.     As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Econazole.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Econazole products manufactured by any Defendant, other than for resale, from July 2014 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Econazole products manufactured by any Defendant, other than for resale, from July 2014 to the present.

## II.     ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President).  The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[7]

---

[7] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016), ECF No. 1; Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016), ECF No. 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

16.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[8]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained:  "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[9]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[10]

17.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[11]

18.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig.*, No.

---

[8] *See* Tr. of Plea Hr'g, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017), ECF No. 24; *see also* Tr. of Plea Hr'g, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017), ECF No. 24.

[9] Press Release, DOJ, *Former Top Generic Pharm. Execs. Charged with Price-Fixing, Bid-Rigging and Customer Allocation Conspiracies* (Dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[10] *See, e.g.*, Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg; David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), *available at* https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

[11] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2:12-md-02311 (E.D. Mich.). As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[12]

19.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least twenty generic drug manufacturers as part of the growing investigation, including: Aceto Corp.; Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mallinckrodt plc; Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Pfizer, Inc. ("Pfizer"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); West-Ward Pharmaceuticals Corp. ("West-Ward"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").[13]

20.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant. DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal

---

[12] *Id.*

[13] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 176.

8

Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[14]

21.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[15]

22.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[16]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[17]

23.     In addition to the federal criminal investigation, the States began an investigation in July 2014 into the dramatic price increases in generic drugs.  The State AG Complaint details

[14] DOJ, Antitrust Division Manual, at III–81–83 (5th ed. 2015), *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[15] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual*, Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[16] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says*, mLex (Feb. 21, 2017).

[17] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download.

frequent collusive communications between generic drug manufacturers and extensive anticompetitive conduct.

24.     The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[18]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.  Generic drug manufacturers "exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[19]

25.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.  The States explain that the anticompetitive "overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in [their] Complaint."[20]  Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.  What is known is that in light of all the evidence described above, the large and unprecedented price increases for generic Econazole cannot be explained by normal, competitive market forces.  The explanation is collusion.

## III.     JURISDICTION AND VENUE

26.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against

---

[18] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[19] State AG Complaint ¶ 9.

[20] State AG Complaint ¶ 92.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

29.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here.  According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[21]

30.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:   (a) transacted business throughout the United States, including in this District; (b) sold Econazole throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme

_____

[21] DOJ, Antitrust Division Manual at III-83.

11

and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District.  In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.   **PLAINTIFFS**

31.   Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York.  District Council 37 (the "Union") is New York City's largest public employee union.  The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers.  Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges.  DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States.  During the Class Period, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in California, Connecticut, Delaware, Florida, Georgia, Kansas, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania, and South Carolina, thereby suffering injury to its business and property.  During the Class Period, DC 37 paid and reimbursed more for these products than

12

it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein.  DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32.     Plaintiff The City of Providence, Rhode Island ("Providence") is a municipal corporation.  Its principal office is located in Providence, Rhode Island.  Providence is a self-insured health and welfare benefit plan, and purchases, pays and/or provides reimbursement for its employees, retirees, and/or plan beneficiaries, who reside in numerous locations in the United States, for some or all of the purchase price of prescription drugs.  During the Class Period, Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by the Defendants.  Providence made such payments and/or reimbursements in California, Florida, New Hampshire, New Jersey, New York and Rhode Island, thereby suffering injury to its business and property. During the Class Period, Providence paid and/or reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Providence was injured in its business or property by reason of the violations of law alleged herein.  Providence intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

33.     Plaintiff Detectives Endowment Association of the City of New York ("DEA") is the second largest labor union representing police officers of the New York City Police Department.  The DEA was founded in 1917 to represent active and retired detectives of the New York City Police Department.  The DEA represents 5,500 active and over 12,400 retired New York City Police Detectives who reside in numerous locations in the United States.  The DEA has its principal place of business in New York, New York.  During the Class Period, the DEA indirectly purchased and paid for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Colorado, Connecticut, Florida, Georgia, Nevada, New Jersey, New Hampshire, New York, North Carolina, Pennsylvania, Puerto Rico, South Carolina, and Virginia thereby suffering injury to its business and property.  During the Class Period, the DEA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, the DEA was injured in its business or property by reason of the violations of law alleged herein.  The DEA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

34.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by the Defendants.

14

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Nebraska, Nevada, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington and the District of Columbia, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein.  BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

35.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members.  It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 260,000 members who reside in numerous locations in the United States.  During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by the Defendants.  SISC made such payments and/or reimbursements in Arizona, California, Florida, Hawaii, Illinois, Kentucky, Minnesota, Nevada, New York, North Carolina, Oregon, Pennsylvania, Utah, and Washington thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

customers for those products.  As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein.  SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

36.     Plaintiff Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund (SBA Fund) is a citizen of the State of New York, and has its principal place of business at 35 Worth Street, New York, New York.  SBA Fund is an independent labor organization operating under Internal Revenue Code section 501(c)(5), and is sponsored and administered by a Board of Trustees.  As such, SBA Fund is a legal entity entitled to bring suit in its own name.  SBA Fund is an "employee welfare benefit plan" and an "employee benefit plan" with membership of approximately 36,000 active and retired sergeants of the New York City Police Department and their dependents.  It provides health care benefits, including prescription drug benefits, to participants and their dependents.  During the Class Period, SBA Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by the Defendants. SBA Fund made such payments and/or reimbursements in Arizona, California, Connecticut, Florida, Kansas, Nevada, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas and Virginia.  During the Class Period, SBA Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, SBA Fund was injured in its business or property by reasons of the violations of law alleged herein.  SBA Fund intends to continue paying and/or reimbursing for these drugs

16

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

37.     Plaintiff United Food & Commercial Workers and Employers Arizona Health and Welfare Trust ("UFCW") is an employee welfare benefits fund with its principal place of business at Maricopa County, Arizona.  During the Class Period, UFCW indirectly purchased and paid for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by one of the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, and New Mexico.  During the Class Period, UFCW purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, Plaintiff UFCW was injured in its business or property by reason of the violations of law alleged herein.  UFCW intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market.  Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Econazole prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in California, Connecticut, Delaware, Florida, Illinois, Indiana, Louisiana, Maine, Massachusetts, Michigan, Nevada, New

17

Hampshire, New Jersey, New York, Ohio, Pennsylvania, Tennessee, Texas, Virginia, and Wisconsin.  During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein.  UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.   **DEFENDANTS**

39.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY.  It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland.  Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Perrigo sold generic Econazole to customers in this District and other locations in the United States.

40.     Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharmaceutical Industries Ltd., an Indian entity.  During the Class Period, Taro sold generic Econazole to customers in this District and other locations in the United States.

41.     Defendant Teligent, Inc. ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey.  Teligent is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Teligent was known as IGI Laboratories, Inc. until 2015.  During the Class Period, Teligent sold generic Econazole to customers in this District and other locations in the United States.

## VI.   CO-CONSPIRATORS

42.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

43.     During the Class Period, Defendants sold and distributed generic Econazole in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

44.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Econazole, took place within the United States, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

45.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Econazole to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

19

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## VIII.   BACKGROUND ON GENERIC DRUG INDUSTRY

### A.   Generic Drugs Are Commodity Products

46.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[22]  "In 2015, generic drug sales in the United States were estimated at $74.5 billion."[23]

47.     According to the FDA, "a generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[24]  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[25]

48.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[26]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[27]

---

[22] GPhA, Generic Drug Savings in the U.S. at 1 (2015) ("GPhA Report"), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[23] Press Release, *Connecticut AG, Conn. Leads 20 State Coal. Filing Fed. Antitrust Lawsuit against Heritage Pharm., other Generic Drug Cos.* (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[24] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G (last visited Aug. 8, 2017).

[25] *Id.*

[26] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.

[27] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Mature generic markets—like that of Econazole—typically have several manufacturers that compete for sales, hence keeping prices in check.

49.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[28]

50.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs.  Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

51.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

52.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of

---

drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.
         [28] GPhA Report at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price."[29]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

53.    It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

54.    When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers:

---

[29] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[30]

55.     When there are multiple generic manufacturers in an established generic market—as with generic Econazole—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing in the U.S. Prescription Drug Industry**

56.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

57.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community

---

[30] GAO Report at 23.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacies to acquire prescription . . . drugs."[31]   "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[32]   In effect, NADAC is "a single national average."[33]  Thus, NADAC is one way to track general price trends in the marketplace.

58.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks-like WACs (Wholesale Acquisition Costs)-for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price.  Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[34]

59.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC.  The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

---

[31] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[32] *Id.* at 15.

[33] *Id.*

[34] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry.  And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing.  NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and sales by manufacturers into various outlets.  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

60.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices-Maximum Allowable Costs ("MACs")-that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

61.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

62.     Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## IX.     THE GENERIC ECONAZOLE CONSPIRACY

### A.     Congressional Responses to Generic Drug Price Increases.

63.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.  These

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

64.     In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases.  Six of those drugs are now the subject of complaints in this MDL.[35]  In November 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").  Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[36]

65.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[37]

66.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[38]  The GAO investigation confirmed that in a competitive market, generic drug prices

---

[35] Press Release, Senator Sanders, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[36] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

[37] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[38] GAO Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

decline and remain stable, absent shortages or other market disruptions.[39]   And this was the case

for most generics.  But it identified numerous drugs that experienced "extraordinary" increases,

which it defined as an increase of more than 100%.[40]  The report identified Econazole as one of

these drugs.

       **B.**      **The Generic Econazole Market**

67.      Econazole is sold throughout the United States and its territories.

68.      The market for generic Econazole is mature and Defendants that operate in that

market can only gain market share by competing on price.  In 2015 alone, Defendants' total

revenue from sales of these products was approximately ███████████[41]  This compares to only

███████████ in 2013, a year before the price-fixing conspiracy.

69.      At all relevant times, Defendants had substantial market power with respect to

generic Econazole.  Defendants exercised this power to maintain supracompetitive prices for

Econazole without losing so many sales as to make the elevated price unprofitable.

70.      Defendants sold generic Econazole at prices in excess of marginal costs, in excess

of a competitive price, and enjoyed high profit margins.

71.      During the Class Period, Defendants dominated the Econazole market.

Defendants controlled approximately ████ of the generic Econazole market, implying a

substantial amount of market power.

---

[39] *Id.* at 23-25.

[40] *Id.* at 1 & Appendix III.

[41] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS
Health").  IMS Health is the largest vendor of physician prescribing data in the United States
and is widely relied upon in the generic pharmaceutical industry and elsewhere.  "Effective
prices" represent actual transaction prices, as reported by IMS Health.

27

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

72.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Econazole.

**C.     Generic Econazole Price Increases**

73.     For years, the prices of Econazole remained relatively low and stable, as economic theory and industry experience would predict of a competitive and mature market for a generic drug.  For example, the prevailing effective price per unit for 85 grams of 1% Econazole cream was approximately ▮▮▮▮▮▮ in every month from at least as far back as January 2011 through September 2013.  Then things changed.  Between September 2013 and the summer of 2014, the same product that for years had cost approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  *See infra* ¶ 75 (graphs of Econazole prices).[42]

(a)     No supply shortages or other market events can explain the Econazole price increases.  The only relevant change in the months preceding the price increases was Teligent's entry to the market.

(b)     On February 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC.  Twice during that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three primary sellers of Econazole had opportunities to discuss Teligent's entry to the market.  *See infra* ¶ 74(a).  Of particular note, the CEOs of Perrigo and Taro joined the Teligent CEO at the GPhA Annual Meeting on Feb. 20-22.  Jason Malek and Jeffrey Glazer of Heritage, and Rajiv Malik of Mylan, each of whom is directly implicated in the "fair share" conspiracy uncovered by the States, also attended this meeting.

---

[42] The language from paragraph 73 in the Aug. 15, 2017 EPP Econazole Complaint now appears in paragraph 74.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)      During this period, Teligent—which had in the past focused on contract manufacturing and product development for other companies—announced its intent to become a generic pharmaceutical manufacturer.[43]  Its ambitions were not limited to Econazole.  Teligent touted its strategic plan to enter the market for numerous topical generic drugs.  It launched its first topical generic drug in December 2012, followed by its acquisition of the Econazole assets and ANDA from Prasco in February 2013. By September 2013, Teligent had 12 ANDAs pending at the FDA.[44]  By June 20, 2014 that number had jumped to 17, with four additional ANDAs submitted under joint-development plans with other manufacturers and another five ANDAs planned for submission by the end of 2014.[45]

(d)      When Teligent acquired the right to sell Econazole, it was the start of a publicly announced plan that would place Teligent in direct competition with Taro and Perrigo across numerous drugs.  Indeed, fast forward to the present and Teligent makes 20 topical drugs (including Econazole) in various formulations (covered by 33 ANDAs).  Seventeen of these drugs are also made by Taro; 15 are also made by Perrigo.  Only two drugs in the Teligent portfolio are not made by either Perrigo or Taro.

(e)      This scenario—where a drug manufacturer plans to enter a market with established, incumbent manufacturers, and where those manufacturers are competitors or potential competitors across multiple drugs—is particularly ripe for a "fair share"

---

[43] *See, e.g.*, IGI Laboratories Inc. 2014 Annual Report (SEC 10-K) at 3, *available at*: https://www.sec.gov/Archives/edgar/data/352998/000114420415016338/v404166_10k.htm

[44] Teligent Press Release (Sept. 18, 2013), *available at*: http://investors.teligent.com/news-releases/news-release-details/igi-laboratories-inc-announces-twelfth-anda-submission

[45] Teligent Press Release (June 20, 2014), *available at*: http://investors.teligent.com/news-releases/news-release-details/igi-laboratories-inc-announces-18th-and-19th-anda-submissions

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

agreement.  Rather than allow competition to drive the price of drugs even lower,

manufacturers can instead agree to "play nice in the sandbox" and keep prices higher.

The conduct of Teligent, Perrigo and Taro after Teligent entered the Econazole market is

entirely consistent with such an agreement.

(f)      Teligent finally launched Econazole under its own label in September

2013.  In a competitive generic drug market, new market entrants typically price their

product below the prevailing market price in order to gain market share. 

(g)

Rather than competing for market share by lowering prices

(or merely seeking to preserve market share by maintaining existing prices), Teligent

made the economically irrational decision to *raise* prices.  On October 28-30, right before

Teligent's higher prices took effect in the marketplace, representatives from Perrigo, Taro

and Teligent converged at a GPhA conference and again had an opportunity to discuss

Econazole market shares and pricing.

(h)      By January 2014,

In a competitive market, this would have provided

an opportunity for Perrigo and Taro to punish Teligent and gain market share by

capitalizing on lower pricing.  But that did not happen.

(i)      In February 2014,                                             .  By

March,                                                              *See infra* ¶ 75.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Taro's prices remained relatively stable during these few months, but that changed after

Defendants met in June 2014 at another trade conference in Maryland.

74.     Generic pharmaceutical manufacturers met for a Generic Pharmaceutical

Association conference on June 3 and 4, 2014 in North Bethesda, Maryland.  Representatives

from Defendants Perrigo, Taro, and Teligent all attended.  Shortly thereafter, beginning at least

as early as July 2014 and continuing to the present, Defendants formed and maintained a price-

fixing cartel that included all of their generic Econazole products.  Senior executives of each

Defendant reached agreement and monitored compliance.  In accordance with their price-fixing

agreement, Defendants caused Econazole prices to skyrocket.  Within a short period after the

June 2014 industry meeting, each Econazole manufacturer dramatically raised its respective list

(WAC) and effective Econazole prices—in certain instances, over ██████ in the span of several

months.

(a)     The following table summarizes trade meetings and opportunities to

conspire between Perrigo, Taro and Teligent and shows the proximity of these meetings

to the price increases that Defendants imposed.[46]  The table also highlights meetings that

are noted in the States' Complaint, as well as meetings that were attended by Heritage.

---

[46] *See infra* ¶¶ 126-45 (identifying specific trade association meetings and attendees that are summarized in the table).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## SUMMARY OF DEFENDANTS' TRADE ASSOCIATION ATTENDANCE AND OPPORTUNITIES TO CONSPIRE

| Date | Trade Association Event | Location | Perrigo Defendant | Taro Defendant | Teligent Defendant | Heritage Defendant | State AG Complaint Citation |
|---|---|---|---|---|---|---|---|
| Oct. 1-3, 2012 | 2012 GPhA Fall Technical Conference | Bethesda, MD | X | | | X | |
| Feb. 20-22, 2013 | 2013 GPhA Annual Meeting | Orlando, FL | X | X | | X | |
| Feb. 24-27, 2013 | 2013 ECRM EPPS Retail Pharmacy Generics | Dallas, TX | X | X | | X | |
| Apr. 20-23, 2013 | NACDS's 2013 Annual Meeting | Palm Beach, FL | X | X | | | |
| Jun. 4-5, 2013 | 2013 GPhA CMC Workshop | Bethesda, MD | X | | | X | ¶256 |
| Aug. 10-13, 2013 | NACDS 2013 Total Store Expo | Las Vegas, NV | X | X | | X | ¶¶260-261 |
| Oct. 28-30, 2013 | 2013 GPhA Fall Technical Conference | Bethesda, MD | X | X | | X | |
| **November 2014** | *Teligent Raises Prices* | | | | | | |
| Feb. 19-21, 2014 | 2014 GPhA Annual Meeting | Orlando, FL | X | X | | X | |
| Feb. 23-26, 2014 | 2014 ECRM EPPS Retail Pharmacy Generics | Amelia Island, FL | X | X | | X | |
| Apr. 26-29, 2014 | NACDS 2014 Annual Meeting | Scottsdale, AZ | X | | X | | |
| Jun. 3-4, 2014 | 2014 GPhA CMC Workshop | Bethesda, MD | X | X | X* | | |
| **July 2014** | *Perrigo Leads Extraordinary Econazole Price Hike* | | | | | | |
| Aug. 23-26, 2014 | NACDS 2014 Total Store Expo | Boston, MA | X | X | | X | ¶140 |
| Oct. 27-29, 2014 | 2014 GPhA Fall Technical Conference | Bethesda, MD | X | X | | X | |
| Feb. 9-11, 2015 | 2015 GPhA Annual Meeting | Miami Beach, FL | X | X | | X | |
| Feb. 22-25, 2015 | 2015 ECRM EPPS Retail Pharmacy Generics | Destin, FL | X | X | | X | ¶88 |
| Apr. 25-28, 2015 | NACDS 2015 Annual Meeting | Palm Beach, FL | X | X | | | |
| Jun. 9-10, 2015 | 2015 GPhA CMC Workshop | Bethesda, MD | X | | | X | |
| Aug. 22-25, 2015 | NACDS 2015 Total Store Expo | Denver, CO | X | X | | X | ¶88 |
| Nov. 2-4, 2015 | 2015 GPhA Fall Technical Conference | Bethesda, MD | X | | X* | X | |
| Apr. 16-19, 2016 | NACDS 2016 Annual Meeting | Palm Beach , FL | X | X | | | |
| Aug. 6-9, 2016 | NACDS 2016 Total Store Expo | Boston, MA | X | | X | | |

* Plaintiffs learned of Teligent's attendance at the June 2014 and November 2015 GPhA events subsequent to the filing of their Aug. 2017 Econazole complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)      Shortly after the June 2014 GPhA meeting, Perrigo implemented extraordinary price increases for its generic Econazole products.  On July 24, 2014, Perrigo announced list price (WAC) increases of more than 600%.  The list price increases were effective. ████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ *See infra* ¶ 75.

(c)      Teligent quickly followed Perrigo's list price (WAC) increase.  On September 1, 2014, Teligent announced *identical* list prices to Perrigo, which amounted to increases of more than 700% over Teligent's old prices.  Teligent's list price increases also were effective. ████████████████████████

███████████████████ *See infra* ¶ 75.

(d)      Taro followed Perrigo's lead, although with less aggressive increases (at first).  After Perrigo's list price (WAC) increases in late July 2014, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████. *See infra* ¶ 75.

(e)      █████████████████████████████████████ it did not announce Econazole list price (WAC) increases until November 18, 2014, at which point Taro set its list prices identical to Perrigo and Teligent.  Thus, in less than four months, Perrigo, Teligent and Taro each imposed extraordinary price increases and announced *identical* WAC prices for all three Econazole products.  As with Perrigo and Teligent, Taro's list price increases were effective. ████████████████████████

██████████████████████████████ *See infra* ¶ 75.

33

(f)      In a competitive market, when one manufacturer raises prices it presents

an opportunity for other manufacturers to offer better prices and gain customers.  Here,

rather than compete, each Defendant raised prices and maintained relatively stable market

shares—a hallmark of the "fair share" agreement.  For example, in the year preceding

Teligent's launch of Econazole under its own label (September 2012 through August

2013) the average monthly market share for Prasco's Econazole products (which Teligent

acquired) was ███████████████████████   In the two years following Teligent's

launch of Econazole products (September 2013 through August 2015) during which time

Defendants raised prices, Teligent's average monthly market share was ██████████

████████████.[47]  Instead of pricing opportunistically (and competitively) to gain

market share, Teligent joined the collusive price increases and accepted its "fair share."

(g)      The pricing conduct by Perrigo, Taro and Teligent was a sharp break from

historical norms for Econazole.  As shown in the graphs below, the list (WAC) prices for

each manufacturer were low, stable and ***different*** for many years.  For example, no

Defendant at any point in at least seven years prior to the Class Period had an identical

list price with another manufacturer.  Moreover, the differences between each

manufacturer's list prices were significant.  For example, the spread between the lowest

list price (Taro) and the highest list price (Teligent/Prasco) exceeded 20% for each

Econazole product.

---

[47] Teligent announced the acquisition of Econazole from Prasco in February 2013 and launched under its own label in September 2013. For a period of time, Econazole under the Prasco label continued to be sold in decreasing amounts, presumably to sell off inventory.  For purposes of these market share calculations, sales by Teligent and Prasco are combined using IMS data.

34

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



(h)    The divergent pricing among Defendants that had prevailed for years (as shown in the charts above) abruptly changed in the second half of 2014 (as shown in the charts below), at which point all Defendants imposed enormous price increases and identical list (WAC) prices.

36

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(i)      The charts above make clear the abruptness and enormity of Defendants' identical list (WAC) price increases.  After many years of different prices across all products, Perrigo, Taro and Teligent aligned prices on every Econazole product and maintained uniformity through the end of 2016.

(j)      The charts above also highlight that Perrigo, Taro and Teligent list (WAC) prices remained elevated above pre-Class Period levels for years.  Although prices for all Defendants have declined from their peak, Perrigo and Taro list prices remain significantly elevated above pre-Class Period levels (more than 100%) even today. Teligent's prices remained elevated approximately 300% above pre-Class Period levels through July 2018.

(k)      The coordinated list (WAC) price increases by Defendants had their intended effect.  ███████████████████████████████████ ████████████████████████████████    The supra-competitive prices imposed by Defendants caused End-Payers to pay more for Econazole than they would have absent Defendants' anticompetitive conduct.

75.      As illustrated below, Defendants' effective prices for generic Econazole products ███████████████████████    ███████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

41

42

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

43

76.     The pricing conduct by each Defendant was not consistent with competition, but instead follows the pattern of "fair share" agreements that have been exposed in the generic drug industry by the States.  The foregoing graphs ████████████████████████████████ ████████████████████████████.  The tables in the following paragraphs provide snapshots of the same pricing data and ████████████████████████████████████████ ████████.[48]

77.     **Perrigo**: For over three years before the Class Period began, the average effective price per unit of its generic Econazole products was: ████████████████ for its 15 gm, 30 gm, and 85 gm products respectively. ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████[49]

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| 15 gm cream | ████ | ████ | ████ | ████ |
| 30 gm cream. | ████ | ████ | ████ | ████ |
| 85 gm cream. | ████ | ████ | ████ | ████ |

---

[48] The language from paragraph 76 in the Aug. 15, 2017 EPP Econazole Complaint now appears in paragraph 77.

[49] Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]"  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.  Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precisely calculated price.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

78. ██████████████████████████████████████████████████

███████████████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| 15 gm cream | ████ | ████ | ████ |
| 30 gm cream | ████ | ████ | ████ |
| 85 gm cream | ████ | ████ | ████ |

79. ██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

80.   **Taro**: For over three years before the Class Period began, the average effective price per unit of its generic Econazole products was: ████████████████ for its 15 gm, 30 gm, and 85 gm products respectively.

81. ██████████████████████████████████████████████████

████████████ ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| 15 gm cream | ████ | ████ | ████ | ████ |
| 30 gm cream | ████ | ████ | ████ | ████ |
| 85 gm cream | ████ | ████ | ████ | ████ |

45

82. ████████████████████████████████████████████████████████

████████████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|------------|------------|---------------------|
| 15 gm cream | ████ | ████ | ████ |
| 30 gm cream | ████ | ████ | ████ |
| 85 gm cream | ████ | ████ | ████ |

83. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

| Product | Price Jun. 2014 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| 15 gm cream | ████ | ████ | ████ |
| 30 gm cream | ████ | ████ | ████ |
| 85 gm cream | ████ | ████ | ████ |

84. **Teligent**: ████████████████████████████████████████

████████████████████████████████████████████ By June 2014,

the average effective price per unit of its generic Econazole products was: ████████████

████ for its 15 gm, 30 gm, and 85 gm products respectively.

85. ████████████████████████████████████████████████████████

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| 15 gm cream | ████ | ████ | ████ | ████ |
| 30 gm cream | ████ | ████ | ████ | ████ |
| 85 gm cream | ████ | ████ | ████ | ████ |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

86. ████████████████████████████████████████

███████████████████████████████████████████

████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| 15 gm cream | ████ | ████ | ████ |
| 30 gm cream | ████ | ████ | ████ |
| 85 gm cream | ████ | ████ | ████ |

87. ████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

| Product | Price Jun. 2014 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| 15 gm cream | ████ | ████ | ████ |
| 30 gm cream | ████ | ████ | ████ |
| 85 gm cream | ████ | ████ | ████ |

88.    Defendants' price increases coincide with increases reported in CMS NADAC data:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Source: NADAC Price Data

89.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to End-Payers.  As explained above in Section VIII.B, a manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts.  Wholesalers then sell the drug to pharmacies, which in turn sell the drugs to End-Payers.  The WAC serves as the benchmark for prices throughout the distribution chain.

90.     Increased WAC prices translate to increases in the prices paid by End-Payers. The following tables demonstrate that Defendants raised their WACs for generic Econazole

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

products to identical prices even though it meant increasing them by as much as 890%.  The WAC prices imposed by each Defendant were identical for each of their Econazole products.[50]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Substantial Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm cream | Perrigo | 45802-0466-35 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 15 gm cream | Teligent | 52565-0022-15 | $0.82 | $5.80 | 1-Sep-14 | 610% |
| 15 gm cream | Taro | 51672-1303-01 | $0.66 | $5.80 | 18-Nov-14 | 779% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Substantial Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 30 gm cream | Perrigo | 45802-0466-11 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 30 gm cream | Teligent | 52565-0022-30 | $0.72 | $5.80 | 1-Sep-14 | 704% |
| 30 gm cream | Taro | 51672-1303-02 | $0.59 | $5.80 | 18-Nov-14 | 890% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Substantial Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 85 gm cream | Perrigo | 45802-0466-53 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 85 gm cream | Teligent | 52565-0022-85 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 85 gm cream | Taro | 51672-1303-08 | $0.42 | $4.09 | 18-Nov-14 | 871% |

---

[50] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.  The WAC prices in the table below have been converted to price per unit.

49

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

91.     Defendants' price increases were not necessitated by increased manufacturing costs because Defendants realized record profits from Econazole sales during the relevant period. To the contrary, anticompetitive activity explains these skyrocketing prices.   Pharmaceutical analyst Richard Evans at Sector & Sovereign Research explained potential causes of generic drug price hikes in a 2015 report:  "A plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics—low sales due to either very low prices or very low volumes—accommodate price inflation[.]"[51]

(a)     Teligent, for one, was motivated to enter into a price fixing conspiracy as its business model depended on its ability to drive sales of Econazole.  In the years prior to joining this conspiracy, Teligent's expenses exceeded revenue "in each of the last nine years, and no net income has been available to common stockholders during each of these years."  Things were so bleak that Teligent warned, "[i]f we do not become profitable or continue to raise external financing, we could be forced to curtail operations and sell or liquidate our business."[52]

(b)     The conspiracy allowed Teligent to become profitable **and** raise external financing.  In November 2014, by which time Teligent had ███████████████ ████████████████████ it entered into an asset-based revolving senior secured credit facility with General Electric Capital Corporation.  In December 2014, Teligent entered

---

[51] Ed Silverman, *Generic Drug Prices Keep Rising but is a Slowdown Coming*, WSJ (Apr. 22, 2015), *available at* https://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[52] Teligent, SEC Form 10-K at 14 (Mar. 16, 2015), *available at* http://investors.teligent.com/node/10326/html.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

into a purchase agreement pursuant to which the Company agreed to sell $125 million aggregate principal amount of its Notes to Deutsche Bank Securities Inc. and J.P. Morgan Securities LLC.

(c)     The supracompetitive prices that Teligent was able to impose because of the Econazole conspiracy had a profound economic effect on the company.  For example, Econazole accounted for 45% of the Company's total revenue during 2015. In contrast, in 2013 (before joining the Econazole conspiracy), Teligent did not have significant revenue from any one product.

92.     There are no competitive explanations for Defendants' price hikes.  There were no supply shortages or disruptions, new patents or formulations, or changes in drug labeling that could explain the abrupt, dramatic, and uniform price hikes.

93.     Federal law requires mandatory drug shortage reporting for drug manufacturers.[53] Econazole is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Econazole also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).  None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Econazole.

---

[53] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 Stat. 995, 1099-1108.

51

**D.      Defendants Praised the Lack of Competition and Resulting Supracompetitive Profits in the Generic Econazole Market**

94.      Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices. Defendants' anti-competitive agreement led to skyrocketing prices for Econazole, as demonstrated in the charts above.

95.      The enormous price hikes were not accompanied by a significant change in costs to manufacturers.  Thus, the increase prices resulted in an enormous increase in profits to Defendants.

96.      Public statements by Defendants and their executives show that Defendants were aware of, and in fact praised, the lack of generic drug competition.

**1.      Teligent**

97.      For instance, on July 24, 2014—just as Econazole prices were beginning to rise—Jason Grenfell-Gardner, President and CEO of what was then IGI Laboratories stated on a second quarter earnings call:  "[P]rices go up and prices [go] down.  What we as a management team have to do is to ensure that we remain alert and we try to maximize the value that we can."

98.      On the next quarterly earnings call, on October 24, 2014, Grenfell-Gardner noted that maximizing value through price increases helped significantly increase the company's revenues:  "Year-to-date in 2014, we recognized $9.3 million in sales of IGI label products, that's an increase of 123% over the same period last year.  This growth has been driven partially through . . . significant price increases for core products in the portfolio."

99.      Grenfell-Gardner and Jenniffer Collins, Teligent's CFO, continued to recognize the "favorable pricing environment" for Econazole in a March 2, 2015, earnings call for the fourth quarter of 2014.  Collins noted that "[w]e increased our gross margin this year to 50% for

52

the year as compared to 34% in 2013." The margin growth was due, in part to "a favorable pricing environment in one of our product[s]."

100.    Grenfell-Gardner explicitly discussed the "positive market conditions" for Econazole during a first quarter earnings call on April 28, 2015, stating: "Over the last two quarters we've seen revenues accelerate as a result of positive market conditions for certain of our products[,] notably for Econazole Nitrate Cream." Echoing Grenfell-Gardner, Collins also attributed the "increase in net revenue" to Econazole, explaining that "[r]evenue from Econazole represented 53% of total revenue in the first quarter of 2015."

101.    Teligent's 2016 annual report likewise confirms that net revenue from Econazole nitrate cream 1% accounted for 45% of total revenues in 2016.[54]

### 2.    Perrigo

102.    Meanwhile, Perrigo stated in its 2014 annual report that "[b]roadening leadership in our core base business of extended topical products with limited competition and attractive margins is a strategic principle driving our continued outperformance in Rx."[55]

103.    Joseph C. Papa, chairman, CEO, and President of Perrigo, has repeatedly emphasized in his statements on quarterly earnings calls that Perrigo's strategy is to maintain "flat to up slightly" pricing across its portfolio by taking advantage of opportunities to increase prices. He repeated that statement on May 7, 2014, during a third quarter earnings call, in which

---

[54] Teligent, SEC Form 10-K at 8 (Mar. 15, 2017), *available at* https://www.sec.gov/Archives/edgar/data/352998/000162828017002606/teligentinc10k123120 16.htm.

[55] Perrigo, 2014 Annual Report, *available at* http://perrigo.investorroom.com/download/AnnualReport2014.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Papa also noted that he "agree[d] that there are some opportunities for us in different business segments."

104.    Papa elaborated on this strategy on August 14, 2014, during Perrigo's fourth quarter earnings call, held within months of the spike in Econazole prices:  "I think there are some opportunities on pricing in the [prescription] category. . . .  Our logic being that in any given year, in any given quarter we may raise prices on product A but then we ma[y] take a concession on Product B and C. . . ."  On the same call, Papa announced "Fiscal 2014 adjusted net income increased 40% to $740 million" and attributed "[t]his strong performance" to "great executions especially within our [prescription] business segment. . . ."

105.    On February 5, 2015, during a first quarter earnings call, Papa noted that prescription drugs, such as Econazole, provided the "greatest upside" for pricing.  This upside was responsible for the fact that Perrigo's prescription business "once again achieved record results," in the first quarter of 2015, "growing sales 12% with an adjusted operating margin of 46%."

### 3.    Taro

106.    During a November 10, 2014 earnings call, held just a few months after the Econazole price spikes, Taro CEO Kal Sundaram attributed the company's significant growth to price increases:

> In 2010, as per IMS data, Taro was ranked third among the
> gene[r]ic dermatology companies in USA.  In terms of sales, now
> it is ranked number one for the past three years.  U.S. remains the
> dominant market for Taro.  Taro's earnings per share also has
> grown 50% CAGR, compounded annual growth, since 2010.
> Taro's sales and earnings growth is attributable to upward price
> adjustments and the prudent life cycle management of our product
> portfolio while our overall volumes remain relatively constant and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

we remain cautious about the long-term sustainability of these prices.

107.    Asked on the same November 10, 2014 earnings call about recent "significant price increases," Sundaram replied:

> Again market to volume fluctuations can happen for very different reasons . . . and when a new generation product comes, it will have [an] impact on the older generation product.  And once again I am saying generics remain to be sort of, what do you say cost value for money and competitive.   I don't think there will be any significant—we have seen any significant impact of volume shifting because of price adjustments.

108.    Mr. Sundaram also noted:

> Net sales for Q2 were $251 million, up 22% over Q2 last year.  As we anticipated in last quarter's earnings release we are realizing the benefits of the previous quarter's price adjustments in the current quarter.  Gross profit increased 24% to $198 million year-on-year resulting in a 130 basis points expansion in our gross margins to 79%.

109.    Sundaram again emphasized Taro's strategy of relying on high-priced generics on a May 27, 2016 quarterly earnings call, stating:  "We are a specialty generic company, so by definition, our portfolio will be obviously narrow but sort of focused.  We operate in niche markets; smaller volumes, but better priced."

110.    On September 13, 2016, *The Economic Times* reported that "While Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases. . . ."[56]

---

[56] Divya Rajagopal, *Taro Pharmaceutical Industries under anti-trust scanner for price hike*, The Economic Times (Sept. 13, 2016), *available at* http://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/taro-pharmaceutical-industries-under-anti-trust-scanner-for-price-hike/articleshow/54302910.cms.

55

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

E.      **Defendants' Conspiracy**[57]

111.    During the Class Period, Defendants conspired, combined, and contracted to fix, maintain, and stabilize the prices, rig bids, and engage in market and customer allocation concerning Econazole, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Econazole.

112.    Defendants' unlawful agreement was furthered by discussions held at meetings and industry events hosted by the GPhA, NACDS, and ECRM as well as other meetings and communications.

113.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

114.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

(a)     The cozy nature of the generic pharmaceutical industry, and the web of relationships and contacts between industry participants, facilitated Defendants' ability to reach an agreement on Econazole market share and pricing.

---

[57] The allegations included in this section pertaining to the NACDS and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

56

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     A number of individuals with leadership roles at Teligent have ties to other MDL Defendants that also are implicated in the Fair Share conspiracy.  For example:

       i.     Jason Grenfell-Gardner joined Teligent as CEO in July 2012. Grenfell-Gardner previously served in a number of roles at MDL Defendant West-Ward Pharmaceuticals (a subsidiary of Hikma Pharmaceuticals, PLC).

      ii.     Damian Finio, who worked with Grenfell-Gardner at West Ward, served briefly on the Teligent Board of Directors in 2014 before leaving that post to become the CFO of MDL Defendant Heritage.  Finio returned to Teligent in 2018 and is the company's current CFO.

      iii.     Carole Ben-Maimon joined the Teligent Board of Directors in 2016.  She has held leadership positions at MDL Defendant Impax Laboratories, Inc., MDL Defendant Qualitest Pharmaceuticals, Inc. (now Par), and MDL Defendant Teva Pharmaceuticals USA. In 2014, when Ben-Maimon was President of Global Pharmaceuticals at Impax, she collaborated with Grenfell-Gardner and Teligent on a development, supply and marketing agreement for a topical generic drug.[58]

      iv.     Narendra Borkar, who served on the Teligent Board of Directors during the relevant time period, is the former CEO of MDL

---

[58] Teligent Press Release (June 20, 2014), *available at* http://investors.teligent.com/news-releases/news-release-details/igi-laboratories-inc-completes-its-seventh-anda-filing-2014

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants Aurobindo Pharma and Caraco Pharmaceutical Laboratories (now part of Sun); and

> v.    Bhaskar Chaudhuri, who served on the Teligent Board of Directors during the relevant time period, is a former President of MDL Defendant Valeant Pharmaceuticals International and former General Manager of the Dermatology Division at MDL Defendant Mylan.

115.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[59]   The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[60]

116.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Econazole, and to engage in market and customer

---

[59] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[60] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

allocation for Econazole, including, but not limited to, GPhA and the NACDS.  In addition, Defendants regularly attended industry events hosted by the ECRM.

117.    The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for manufacturers and distributors of generic prescription drugs."[61]  GPhA was formed in 2000 from the merger of three industry trade associations:  the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

118.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[62]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

119.    Defendant Perrigo was a regular member of the GPhA during the Class Period, and Defendants Taro and Teligent (formerly known as IGI Laboratories, Inc.) frequently attended GPhA meetings, including the Annual and Fall Technical meetings in 2014 and 2015 as well as workshops, among other meetings  Regular members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[63]

---

[61] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership

[62] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership

[63] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

120.    Before and during the Class Period, Doug Boothe, Executive VP and General Manager of Perrigo (2013–2015), and Richard Stec, Perrigo's Vice President of Global Regulatory Affairs (2016) served on the GPhA Board of Directors, along with former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to price fixing and other anticompetitive activity concerning generic drugs.

121.    The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies.  NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

122.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

123.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

124.    ███████████████████████████████████████████████

███████

125.    As further set forth below, meetings and events hosted by the GPhA, NACDS, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

126.    On October 1–3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of at least Defendants Perrigo and Taro.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

127.   On February 20–22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida that was attended by representatives of at least Defendants Perrigo, Taro, and Teligent.

(a)   **Perrigo:** Douglas Boothe, President of Generics Division; Judy Brown, Chief Financial Officer; Joseph Papa, Chairman and CEO; Richard Stec, Vice President of Global Regulatory Affairs;

(b)   **Taro:** Kim DiPadova; Kal Sundaram, CEO; and

(c)   **Teligent:** Jason Grenfell-Gardner, President and CEO.

128.   On February 24–27, 2013, ECRM held its annual Retail Pharmacy Efficient Program Planning Session at the Sheraton Hotel, Dallas, Texas. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

(a)   ████████████████████████████████████████████

████████████████████████████████████████████

(b)   ████████████████████████████████████████████

████████████████████████████████████; and

(c)   ████████████████████████████████████████████

████████████████████████

129.   On April 20–23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives of at least Defendants Perrigo and Taro, including at least the following key executives:

(a)   **Perrigo**: Joseph Papa, Chairman and CEO; Doug Boothe, President of Generics Division; Jim Tomshack, Sr. VP of Sales; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)    **Taro**: Jim Kedrowski, Interim CEO; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; Ara Aprahamian, VP of Sales & Marketing; Michael Perfetto, CCO Generics RX/OTC US and Canada.

130.    On June 4–5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of at least Defendants Perrigo and Taro.

131.    On August 10–13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by at least the following representatives from Defendants, who were the key executives for generic drug sales and pricing:

(a)    **Perrigo**: H. James Booydegraaff, Associate Director, Marketing; Andrea Felix, National Account Executive; Kara Goodnature, Marketing Manager; Ori Gutwerg, National Account Executive; Pete Haakenstad, National Account Manager; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President & General Manager; Tony Polman, National Account Executive; and

(b)    **Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Sheila Curran, Vice President, Sales Operations; Howard Marcus, VP Sales & Marketing; Michael Perfetto, Group Vice President and Chief Commercial Officer of the Generic RX Business; Doug Statler, Sr. Director/Head of Sales.

132.    On October 28–30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from at least Defendants Perrigo, Taro, and Teligent.

133.    On February 19–21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from at least Defendants Perrigo, Taro, and Teligent:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)      **Perrigo**: Douglas Boothe, President of Generics Division; Judy Brown, Chief Financial Officer; Joseph Papa, Chairman and CEO; Richard Stec, Vice President of Global Regulatory Affairs;

(b)      **Taro:** Ara Aprahamian, Vice President, Sales & Marketing, Kim DiPadova; and

(c)      **Teligent:** Jason Grenfell-Gardner, President and CEO; Thomas Vandervort, Director of Business Development.

134.    On February 23–6, 2014, ECRM held its annual Retail Pharmacy Efficient Program Planning Session at Omni Amelia Island Plantation Resort in Amelia Island, Florida.



135.    On April 26–29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)      **Perrigo**: Doug Boothe, President Generics Division; Tony Polman, National Account Executive; John Wesolowski, Acting General Manager; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b) **Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada;

136.    On June 3–4, 2014, GPHA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Defendants Perrigo, Taro and Teligent, including at least the following key executives:

(a) **Perrigo**: Richard Stec, Vice President Global Regulatory Affairs; Keith Webber, Head of Regulatory Review;

(b) **Taro**: Scott Tomsky, Vice President, Generic Regulatory Affairs, North America; Siva Vaithiyalingam, Director, Regulatory Affairs; and

(c) **Teligent**: Ann Howard, Senior Regulatory Affairs Associate.

137.    On August 23–26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from Defendants, including at least the following key executives for generic drug sales and pricing:

(a) **Perrigo**: Doug Boothe, President Generics Division; H. James, Booydegraaff Associate Director, Marketing; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President & General Manager; Kristine Norman, Account Executive; Tony Polman, National Account Executive; John Wesolowski, Acting General Manager; and

(b) **Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing & Business Development, US and Canada; Christopher Urbanski, Director, Corporate Accounts;

64

138.    On October 27–29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of at least Defendants Perrigo, Taro, and Teligent.

139.    The GPhA Annual Meeting in Miami Beach, Florida on February 9–11, 2015 was attended by representatives of at least Defendants Perrigo, Taro, and Teligent:

(a)     **Perrigo:** Douglas Boothe, President of Generics Division; Judy Brown, Chief Financial Officer; Ben Needham, Manager Corporate Development; Joseph Papa, Chairman and CEO; Richard Stec, Vice President of Global Regulatory Affairs;

(b)     **Taro:** Ara Aprahamian, Vice President, Sales & Marketing, Kim DiPadova, Xiaopin Jin; and

(c)     **Teligent:** Jason Grenfell-Gardner, President and CEO.

140.    On February 22–25, 2015, ECRM held its annual Retail Pharmacy Efficient Program Planning Session at the Hilton Sandestin Beach Golf Resort & Spa in Destin, Florida.

████████████████████████████████████████

████████████████████████████████████

(a)     ████████████████████████████████████

████████████████████████████████████

(b)     ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ and

(c)     ████████████████████████████████████

████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

141.     On April 25–28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida.   NACDS's 2015 annual meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)     **Perrigo**: Doug Boothe, President Generic Division; Christopher Kapral, SVP, Consumer Healthcare Sales; Andy Kjellberg, VP Consumer Healthcare Sales; Mark Walin, VP Consumer Healthcare Sales; Michael Yacullo, VP Consumer Healthcare Sales; and

(b)     **Taro**: Ara Aprahamian, VP Sales & Marketing; Michael Perfetto, CCO Generics RX/OTC US and Canada.

142.     On June 9–10, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of at least Defendants Perrigo and Taro.

143.     On August 22–25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado.  NACDS's August 2015 Total Store Expo was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)     **Perrigo**: Doug Boothe, President Generic Division; Christopher Kapral, SVP, Consumer Healthcare Sales; Andy Kjellberg, VP Consumer Healthcare Sales; Mark, Walin, VP Consumer Healthcare Sales; Michael Yacullo, VP Consumer Healthcare Sales; and

(b)     **Taro**: Ara Aprahamian, VP Sales & Marketing; Alex Likvornik, Sr. Director, Strategic Pricing & Marketing;

144.     On November 2–4, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Perrigo, Taro and Teligent.

66

145.    Defendants continued to attend trade association meetings and conference throughout 2016, including:  (i) NACDS's 2016 annual meeting at The Breakers, Palm Beach, Florida on April 16–19, 2016; and (ii) NACDS's 2016 Total Store Expo at the San Diego Convention Center in San Diego, California on August 19–22, 2016.

146.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[64]

147.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[65]

148.    A large number of generic drug manufacturers, including Defendants Taro and Teligent are headquartered or have major offices in close proximity to one another in New Jersey, New York, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including

---

[64] *See, e.g.*, State AG Complaint ¶¶ 76-80.
[65] *Id.* ¶¶ 81-88.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

149.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.   Several different GNOs were held in 2015, including:  (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

150.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

151.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.   This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

152.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

F.      **Factors Increasing the Market's Susceptibility to Collusion**

153.    Publicly available data on the generic Econazole market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

1.      **Industry Concentration**

154.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.  Here, Defendants controlled approximated ████ of the generic Econazole market during the Class Period.

155.    While the market for Econazole is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition.  Absent collusion, prices would have remained at competitive levels.

156.    No departures from the market by manufacturers of Econazole can explain the price increases.

157.    Defendants have been able to maintain supracompetitive prices for Econazole without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Econazole.

158.    The magnitude of Defendants' price increases for Econazole distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price increase.   But here the increases are extreme—jumping as much as ███████ in some instances.  Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to Entry

159.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

160.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Econazole markets that make such entry time-consuming and expensive.

161.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Econazole markets.

162.    Grenfell-Gardner and Collins of Teligent (formerly known as IGI Laboratories), also repeatedly acknowledged that the "US topical market" has "significant barriers to entry."

163.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time.  As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

nearly four years."[66]  This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.    Demand Inelasticity

164.    Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  It is a measure of how demand for a product reacts to a change in price. The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

165.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

166.    Demand for generic Econazole is highly inelastic.  When doctors prescribe generic Econazole, patients view it as necessary to their well-being.  This gives Defendants significant pricing power, as well as an incentive to collude.

167.    Thus, generic Econazole is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

---

[66] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 4.    Lack of Substitutes

168.    Econazole has a unique active ingredient, chemistry, and pharmacokinetics compared with other antifungals in its class.  There are no reasonable substitutes for Econazole that are therapeutically equivalent.

169.    Thus, Econazole is a necessity for the more than one million patients to whom it's prescribed and who must purchase it regardless of price hikes.  These purchasers are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized Product with High Degree of Interchangeability

170.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

171.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price.  When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

172.    Defendants' generic Econazole products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

173.    Moreover, because generic Econazole products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.

72

Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[67]  The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor Contacts and Communications

174.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events.  Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.  As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[68]

175.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events.  For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

---

[67] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[68] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

176.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[69]  The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

(a)    **Aceto**:   On April 23, 2018, Aceto disclosed: "In connection with the DOJ's ongoing investigation into marketing and pricing practices throughout the generic pharmaceutical industry, Aceto Corporation (the "Company") received a subpoena from the Antitrust Division of the U.S. Department of Justice (the "DOJ"). The Company is one of many operating companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry.[70]

(b)    **Actavis**:   In February 2016, Actavis's former corporate parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[71]

---

[69] State AG Complaint ¶ 7.

[70] Aceto, SEC 2018 Form 8-K (April 23, 2018), *available at* http://investor.aceto.com/static-files/6fed4dee-5d2f-419c-9c11-6b9828c079d1.

[71] Allergan, SEC 2015 Form 10-K at F-106 (Feb. 26, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

74

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)   **Aurobindo**:   Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[72]   The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[73]

(d)   **Citron**:   In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."   The Connecticut AG requested that Citron produce all documents produced to DOJ.[74]

(e)   **Dr. Reddy's**:   In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[75]

(f)   **Heritage**:   As a private company, Heritage is not required to make public disclosures.   Nonetheless, in the wake of the criminal guilty pleas by two of its

---

[72] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit*, Reuters (Dec. 15, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[73] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[74] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm (last visited Aug. 10, 2017).

[75] Dr. Reddy's, SEC Form 6-K at 57 (Dec. 31, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

executives, Heritage confirmed that it is "fully cooperating" with DOJ,[76] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[77]

(g) **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[78]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[79]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular . . . digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[80]

---

[76] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[77] *See supra* ¶ 22.

[78] Impax, SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[79] Impax, SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[80] Impax, SEC 2015 Form 10-K at F-53 (Feb. 22, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

76

(h)     **Lannett**:  In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[81]   On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."  The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[82]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[83]

(i)     Mallinckrodt:  "*Generic Pricing Subpoena.* In March 2018, the Company received a grand jury subpoena issued by the U.S. District Court for the Eastern District of Pennsylvania pursuant to which the Antitrust Division of the Department of Justice is seeking documents regarding generic products and pricing, communications with generic

---

[81] Press Release, Lannett, *Lannett Receives Inquiry From Conn. AG* (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[82] Lannett, SEC Form 10-Q at 16 (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[83] Lannett, SEC Form 10-K at 18 (Aug. 27, 2015), available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competitors and other related matters. The Company is in the process of responding to this subpoena, and the Company intends to cooperate fully in the investigation."[84]

(j)     **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[85]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating:  "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products.  The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[86]

(k)     **Mylan**:   In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's   generic   products   (including   Doxycycline)   and   communications   with

---

[84] Mallinckrodt plc, SEC Form 10-Q at 24 (May 8, 2018), *available at* https://www.sec.gov/Archives/edgar/data/1567892/000156789218000025/mnk10-q033018.htm

[85] Mayne, 2016 Annual Report at 75 (Aug. 25, 2016), *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[86] Mayne, *Update on DOJ Investigation* (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competitors about such products."[87]   On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[88]

(l)    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[89]   In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania.  The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[90]   Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of

---

[87] Mylan, SEC 2015 Form 10-K at 160 (Feb. 16, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231x doc.htm.

[88] Mylan SEC Form 10-Q at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930x doc.htm.

[89] Par, SEC 2014 Form 10-K at 37 (Mar. 12, 2015), *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[90] Endo, SEC Form 10-Q at 30 (March 31, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[91]

(m)  **Perrigo**: On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[92]

(n)  **Pfizer:** On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[93]

(o)  **Sandoz**: In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[94]

---

[91] *Id.* at 31.

[92] Press Release, Perrigo, Perrigo Discloses Investigation (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[93] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

[94] Novartis, 2016 Financial Report at 217 (Jan. 24, 2017), *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(p)    **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Taro) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[95]

(q)    **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[96]

(r)    **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[97]

---

[95] Sun, BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[96] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[97] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(s)     **West-Ward**: "In 2017 the Group received two subpoenas from a US state attorney general and the US Department of Justice, each requesting information related to certain products, pricing and related communications."[98]

(t)     **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[99]

## X.     THE STATUTES OF LIMITATION DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

177.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the government investigations and subpoenas.   Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Econazole.

178.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Econazole.

179.    Plaintiffs are purchasers who indirectly purchased generic Econazole manufactured by one or more Defendants.   They had no direct contact or interaction with any of

---

[98] Hikma Pharmaceuticals PLC, Annual Report 2017 at 163 (Mar. 14, 2018), *available at* https://hikma-investors.azurewebsites.net/_assets/pdf/Hikma-AR-2017.pdf

[99] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

180.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint.  For example:

(a)    Perrigo's Code of Conduct provides:  "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices.  Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[100]

(b)    Taro's Code of Conduct provides:  "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition. If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate.  Leave the conversation immediately, and report the matter to Corporate Compliance."[101]

---

[100] Perrigo Code of Conduct at 8, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf (last visited Aug. 9, 2017).

[101] Taro Code of Conduct at 14, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf (last visited Aug. 9, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)     IGI Laboratories's (predecessor to Teligent) Standards of Business

Conduct state:  "IGI is committed to compliance with the anti-trust laws of the United

States."[102]

181.    It was reasonable for members of the Class to believe that Defendants were

complying with their own antitrust policies.

182.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the

federal and state common laws identified herein did not begin to run, and have been tolled with

respect to the claims that Plaintiffs have alleged in this Complaint.

**B.     Fraudulent Concealment Tolled the Statutes of Limitation**

183.    In the alternative, application of the doctrine of fraudulent concealment tolled the

statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the

combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on

inquiry notice of their claims, until Defendants disclosed the existence of government

investigations and subpoenas.  Prior to that time, no information in the public domain or

available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix

prices for generic Econazole.

184.    No information evidencing antitrust violations was available in the public domain

prior to the public announcements of the government investigations that revealed sufficient

information to suggest that any of the defendants was involved in a criminal conspiracy to fix

prices for generic Econazole.

---

[102] IGI Labs Standards of Business Conduct at 13, *available at*
http://teligent.investorroom.com/download/2012+Standards+of+Business+Conduct.pdf (last
visited Aug. 9, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

185.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Econazole.   The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Econazole they purchased.   Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Econazole.   Defendants' false statements and conduct concerning the prices of generic Econazole were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Econazole at prices established by a free and fair market.

### 1.    Active Concealment of the Conspiracy

186.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.   Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

187.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes.   Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts.   The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Econazole.

188.    As explained in the State AG complaint, the nature of the generic drug industry— which allows for frequent and repeated face-to-face meetings among competitors—means that

Defendants were able to obscure their illegal conduct. "The Defendants knew their conduct was unlawful. The conspirators usually chose to communicate in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The structure of the generic drug industry provided numerous opportunities for collusive communications at trade shows, customer events and smaller more intimate dinners and meetings. When communications were reduced to writing or text message, Defendants often took overt and calculated steps to destroy evidence of those communications."[103]

189.    The Defendants also gave pretextual reasons for price increases.  For example, Taro's parent company, Taro Pharmaceutical Industries Ltd., stated in a 2014 annual filing with the SEC:  "The pharmaceutical industry in which we operate is intensely competitive.  The competition which we encounter has an effect on our product prices, market share, revenue and profitability."[104]  Teligent (when it was known as IGI Laboratories) used almost identical language in documents filed with the SEC in early 2015:  "The pharmaceutical industry in which we operate is intensely competitive.  The competition that we encounter has an effect on our product prices, market share, revenue and profitability."[105]  Perrigo's parent company, Perrigo Company plc, told the SEC in 2014:  "The market for generic prescription drugs is subject to intense competition from other generic drug manufacturers, brand-name pharmaceutical companies launching their own generic version of a branded product (known as an authorized

---

[103] State AG Complaint ¶ 15.

[104] Taro, SEC Form 20-F at 3 (July 2, 2014), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-sec.

[105] IGI Labs., SEC Form 10-K at 15 (Mar. 16, 2015), *available at* https://www.sec.gov/Archives/edgar/data/352998/000114420415016338/v404166_10k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic), manufacturers of branded drug products that continue to produce those products after patent expirations and manufacturers of therapeutically similar drugs."[106]

190.     These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Econazole to inflated, supracompetitive levels.

## 2.     Plaintiffs Exercised Reasonable Diligence

191.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

192.     Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

193.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

---

[106] Perrigo, SEC Form 10-K at 8 (Aug. 14, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1585364/000158536414000019/a2014q410k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

194.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XI.    CONTINUING VIOLATIONS

195.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.    DEFENDANTS' ANTITRUST VIOLATIONS

196.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Econazole sold in the United States.

197.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Econazole sold in the United States. These activities included the following:

(a)    Defendants participated in meetings and/or conversations regarding the price of generic Econazole in the United States;

(b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Econazole sold in the United States;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)      Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Econazole; and

(d)      Defendants issued price announcements and price quotations in accordance with their agreements.

198.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

199.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Econazole at inflated and supracompetitive prices.

200.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

201.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Econazole than they would have paid in a competitive market.

202.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class.  The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Econazole.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

203.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Econazole has been artificially restrained;

(b)    prices for generic Econazole sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    end-payer purchasers of generic Econazole sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Econazole.

## XIII.  CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' Econazole products (generic econazole nitrate 1% cream (15, 30, or 85gm)), other than for resale, from July 2014 through the present.

> This class excludes:  (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Econazole products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Econazole products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

205.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[107] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' econazole products (generic Econazole nitrate 1% cream (15, 30, or 85gm)), other than for resale, from July 2014 through the present.
>
> This class excludes:  (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Econazole products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Econazole products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

206.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

207.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

208.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to

---

[107] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Econazole and/or engaged in market allocation for generic Econazole sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Econazole sold in the United States during the Class Period;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Econazole, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

(l)     Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Econazole purchased indirectly from Defendants and/or their co-conspirators.  Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

209.    Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

210.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

211.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

212.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIV.   CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

213.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

214.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

215.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Econazole, thereby creating anticompetitive effects.

94

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

216.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Econazole.

217.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Econazole have been harmed by being forced to pay inflated, supracompetitive prices for generic Econazole.

218.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

219.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Econazole has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Econazole provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Econazole indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

220.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Econazole purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

221.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

222.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[108]
### (on behalf of Plaintiffs and the Damages Class)

223.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

224.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Econazole in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

225.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Econazole and to allocate customers for generic Econazole in the United States.

226.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Econazole at certain levels, and otherwise to

---

[108] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Econazole provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

227.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Econazole.

228.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

229.    [Intentionally Left Blank]

**Arizona**

230.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq.* Defendants' combination and conspiracy had the following effects: (1) price competition for generic Econazole was restrained, suppressed, and eliminated throughout Arizona; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev.

97

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Stat. § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

**California**

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Econazole at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Econazole. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Econazole. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Econazole has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Econazole provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Econazole indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured

98

in their business and property in that they paid more for generic Econazole than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

### Connecticut

231(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Econazole was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

99

**District of Columbia**

232.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.* Defendants' combination and conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Econazole in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Econazole in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Econazole, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**Hawaii**

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct

100

had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq.*

**Illinois**

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages

Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

235.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following

effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated

throughout Iowa; (2) generic Econazole prices were raised, fixed, maintained and stabilized at

artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period,

Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate

result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been

injured in their business and property and are threatened with further injury. By reason of the

foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa

Code § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms

of relief available under Iowa Code § 553, *et seq.*

**Kansas**

236.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Kansas Statutes Annotated, § 50-101, *et seq.* Defendants' combined capital, skills or

acts for the purposes of creating restrictions in trade or commerce of generic Econazole,

increasing the prices of generic Econazole, preventing competition in the sale of generic

Econazole, or binding themselves not to sell generic Econazole, in a manner that established the

price of generic Econazole and precluded free and unrestricted competition among themselves in

102

the sale of generic Econazole, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants'

combination or conspiracy had the following effects: (1) generic Econazole price competition

was restrained, suppressed, and eliminated throughout Kansas; (2) generic Econazole prices were

raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially

affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury. By reason of the foregoing, Defendants have entered into

an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly,

Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas

Stat. Ann. § 50-101, *et seq.*

**Maine**

237.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants'

combination or conspiracy had the following effects: (1) generic Econazole price competition

was restrained, suppressed, and eliminated throughout Maine; (2) generic Econazole prices were

raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs

and members of the Damages Class were deprived of free and open competition; and (4)

Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices

for generic Econazole. During the Class Period, Defendants' illegal conduct substantially

affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

**Maryland**

237(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole.  During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

238.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq.* Defendants' combination or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

**Minnesota**

239.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq.*

**Nevada**

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

107

Econazole. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq.*

**New Hampshire**

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

244.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

245.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

109

supracompetitive, artificially inflated prices for generic Econazole that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq.*

**North Carolina**

246.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et*

110

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

**North Dakota**

247.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

**Oregon**

248.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the

111

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

**Rhode Island**

249.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq.* Accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

**South Dakota**

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs

113

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Accordingly, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

**Vermont**

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

**West Virginia**

254.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout West

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Virginia; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq.*

### Wisconsin

255.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

**As to All Jurisdictions Above**

256.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Econazole than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

257.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

258.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## THIRD COUNT

### Violation of State Consumer Protection Statutes[109]
### (on behalf of Plaintiffs and the Damages Class)

259.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

260.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

261.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Econazole were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and

---

[109] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

262.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Econazole were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce

119

and consumers. As a direct and proximate result of the unlawful conduct of Defendants,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury. Defendants have engaged in unfair competition or unfair

or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and,

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

statute.

**California**

263.    Defendants have engaged in unfair competition or unfair, unconscionable,

deceptive or fraudulent acts or practices in violation of California Business and Professions Code

§ 17200, *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or

distributed generic Econazole in California, and committed and continue to commit acts of unfair

competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by

engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203

and 17204 of the California Business and Professions Code, to obtain restitution from these

Defendants for acts, as alleged herein, that violated § 17200 of the California Business and

Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as

alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-

disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing

course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business

acts or practices within the meaning of California Business and Professions Code §17200, *et*

*seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman

Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and

Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices,

120

and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Econazole in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Econazole. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Colorado**

264.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

265.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

122

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

levels, the prices at which generic Econazole were sold, distributed, or obtained in Delaware.

Defendants deliberately failed to disclose material facts to Plaintiffs and members of the

Damages Class concerning Defendants' unlawful activities and artificially inflated prices for

generic Econazole. Defendants misrepresented to all purchasers during the Class Period that

Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct

had the following effects: (1) generic Econazole price competition was restrained, suppressed,

and eliminated throughout Delaware; (2) generic Econazole prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on

Delaware commerce and consumers. As a direct and proximate result of Defendants' violations

of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or

property as a result of Defendants' use or employment of unconscionable and deceptive

commercial practices as set forth above. That loss was caused by Defendants' willful and

deceptive conduct, as described herein. Defendants' deception, including their affirmative

misrepresentations and omissions concerning the price of generic Econazole, likely misled all

purchasers acting reasonably under the circumstances to believe that they were purchasing

generic Econazole at prices set by a free and fair market. Defendants' misleading conduct and

unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly,

Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

266.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Econazole were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Econazole because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Econazole, including their illegal conspiracy to secretly fix the price of generic Econazole at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Econazole. Defendants' unlawful conduct had the following effects: (1) generic

124

Econazole price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

268.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

### Hawaii

269.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

127

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Massachusetts**

270.     Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq.* Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Econazole were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and,

128

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

271.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Minnesota

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly,

130

Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

273.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* Plaintiffs and members of the Damages Class purchased generic Econazole for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Econazole in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Econazole by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Econazole were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Econazole at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Econazole price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants marketed, sold, or distributed generic Econazole in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, et. seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants marketed, sold, or distributed generic Econazole in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et*

133

*seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

276.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and

134

omissions concerning the price of generic Econazole, likely misled all purchasers acting

reasonably under the circumstances to believe that they were purchasing generic Econazole at

prices set by a free and fair market. Defendants' misleading conduct and unconscionable

activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs

and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

277.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H.

Rev. Stat. § 358-A:1, *et seq.*  Defendants' unlawful conduct had the following effects: (1)

generic Econazole price competition was restrained, suppressed, and eliminated throughout New

Hampshire; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages

Class were deprived of free and open competition; and (4) Plaintiffs and members of the

Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During

the Class Period, Defendants marketed, sold, or distributed generic Econazole in New

Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce

and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured. Defendants have engaged in unfair

competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et*

*seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available

under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Jersey**

278.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in New Jersey.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole.  Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair.  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole.  During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing

136

generic Econazole at prices set by a free and fair market.  Defendants' misleading conduct and

unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly,

Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.* Defendants

agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling

and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic

Econazole were sold, distributed or obtained in New Mexico and took efforts to conceal their

agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on

the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico

Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value

received by Plaintiffs and members of the Damages Class and the prices paid by them for generic

Econazole as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages

Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that

they were being unfairly and illegally overcharged. Defendants had the sole power to set that

price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price.

Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in

purchasing generic Econazole because they were unaware of the unlawful overcharge, and there

was no alternative source of supply through which Plaintiffs and members of the Damages Class

could avoid the overcharges. Defendants' conduct with regard to sales of generic Econazole,

including their illegal conspiracy to secretly fix the price of generic Econazole at

supracompetitive levels and overcharge consumers, was substantively unconscionable because it

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The

suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted

in unconscionably higher prices for consumers so that there was a gross disparity between the

price paid and the value received for generic Econazole. Defendants' unlawful conduct had the

following effects: (1) generic Econazole price competition was restrained, suppressed, and

eliminated throughout New Mexico; (2) generic Econazole prices were raised, fixed, maintained,

and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of

the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members

of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole.

During the Class Period, Defendants' illegal conduct substantially affected New Mexico

commerce and consumers. As a direct and proximate result of the unlawful conduct of

Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened

with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

**New York**

280.     Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed

to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or

maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were

sold, distributed or obtained in New York and took efforts to conceal their agreements from

Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

statements about the prices of generic Econazole that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Econazole; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Econazole were misled to believe that they were paying a fair price for generic Econazole or the price increases for generic Econazole were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Econazole would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Econazole would have a broad impact, causing consumer class members who indirectly purchased generic Econazole to be injured by paying more for generic Econazole than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

139

Econazole. During the Class Period, Defendants marketed, sold, or distributed generic Econazole in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

281.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina

law, which resulted in consumer injury and broad adverse impact on the public at large, and

harmed the public interest of North Carolina consumers in an honest marketplace in which

economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the

following effects: (1) generic Econazole price competition was restrained, suppressed, and

eliminated throughout North Carolina; (2) generic Econazole prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Econazole. During the Class Period, Defendants marketed, sold, or distributed generic Econazole

in North Carolina, and Defendants' illegal conduct substantially affected North Carolina

commerce and consumers. During the Class Period, each of Defendants named herein, directly,

or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or

distributed generic Econazole in North Carolina. Plaintiffs and members of the Damages Class

seek actual damages for their injuries caused by these violations in an amount to be determined

at trial and are threatened with further injury. Defendants have engaged in unfair competition or

unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*,

and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under

that statute.

### North Dakota

282.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising

Practices Statute, N.D. Century Code § 51-15-01, *et seq.*  Defendants agreed to, and did in fact,

141

act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or

maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were

sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material

facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities

and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers

during the Class Period that Defendants' generic Econazole prices were competitive and fair.

Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition

was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Econazole

prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North

Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal

conduct had a substantial effect on North Dakota commerce and consumers. As a direct and

proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class

suffered an ascertainable loss of money or property as a result of Defendants' use or employment

of unconscionable and deceptive commercial practices as set forth above. That loss was caused

by Defendants' willful and deceptive conduct, as described herein. Defendants' deception,

including their affirmative misrepresentations and omissions concerning the price of generic

Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that

they were purchasing generic Econazole at prices set by a free and fair market. Defendants'

misleading conduct and unconscionable activities constitute violations of N.D. Century Code §

51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief

available under that statute.

142

**Rhode Island**

283.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Members of the Damages Class purchased generic Econazole for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That

143

loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

284.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

285.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants'

145

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

286.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.*  Members of the Damages Class purchased generic Econazole for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Econazole prices were

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

287.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Vermont. Defendants

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class

concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole.

Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication

of the average, non-business purchaser, Defendants breached that duty by their silence.

Defendants misrepresented to all purchasers during the Class Period that Defendants' generic

Econazole prices were competitive and fair. Defendants' unlawful conduct had the following

effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated

throughout Vermont; (2) generic Econazole prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supracompetitive, artificially inflated prices for generic Econazole. During the Class

Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and

consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and

members of the Damages Class suffered an ascertainable loss of money or property as a result of

Defendants' use or employment of unconscionable and deceptive commercial practices as set

forth above. That loss was caused by Defendants' willful and deceptive conduct, as described

herein. Defendants' deception, including their affirmative misrepresentations and omissions

concerning the price of generic Econazole, likely misled all purchasers acting reasonably under

the circumstances to believe that they were purchasing generic Econazole at prices set by a free

and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair

competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq.*, and,

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Virginia**

288.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.*  Members of the Damages Class purchased generic Econazole to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic

149

Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### West Virginia

289.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

290.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Econazole prices

151

were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### U.S. Virgin Islands

291.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Econazole. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## FOURTH COUNT

### Unjust Enrichment[110]
### (on behalf of Plaintiffs and the Damages Class)

292.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

293.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

294.    Defendants have unlawfully benefited from their sales of Econazole because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole at prices that were more than they would have been but for Defendants' unlawful actions.

295.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

296.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

297.    Defendants have been enriched by revenue resulting from unlawful overcharges for Econazole while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Econazole imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

298.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class,

---

[110] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

299.     Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

300.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Econazole.

301.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Econazole are ascertainable by review of sales records.

302.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Econazole.

303.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Econazole, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

304.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Econazole is a direct and proximate result of Defendants' unlawful practices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

305.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

306.     It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Econazole derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

307.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

308.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Econazole.

309.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Econazole by Plaintiffs and the Damages Class.

310.     Plaintiffs and the Damages Class have no adequate remedy at law.

311.     By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Econazole and forcing them to pay higher prices for Econazole, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Alabama**

312.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Econazole.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

313.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

314.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

overcharges for Econazole. Plaintiffs and the Damages Class have been impoverished by the overcharges for Econazole resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

315.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

316.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Colorado**

317.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Connecticut**

318.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

319.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Econazole.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Econazole resulting from Defendants' unlawful conduct.  Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

320.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

321.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Georgia**

322.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

323.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

324.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

325.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

326.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Econazole, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

327.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Kansas at prices that were more than they would have been but

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit

upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic

detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon

them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the

Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such

benefits without compensating Plaintiffs and the Damages Class.

### Kentucky

328.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Econazole in Kentucky at prices that were more than they would have been

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the

Damages Class.

### Louisiana

329.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Econazole in Louisiana at prices that were more than they would have been

but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful

overcharges for Econazole.  Plaintiffs and the Damages Class have been impoverished by the

overcharges for Econazole resulting from Defendants' unlawful conduct.  Defendants'

enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no

justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

330.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

331.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Massachusetts**

332.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

333.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

334.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

165

economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

335.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Econazole, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

336.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

166

**Montana**

337.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

338.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Econazole. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.  Under the circumstances, it

167

would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### New Hampshire

340.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in New Hampshire at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

### New Jersey

341.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Econazole. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

342.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Econazole.  To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

343.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Econazole, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

344.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did

169

not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

### North Dakota

345.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Econazole.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Econazole resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Oklahoma

346.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Plaintiffs and the Damages Class have no remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

347.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Oregon at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

348.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Puerto Rico**

349.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Econazole.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Econazole resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

350.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**South Carolina**

351.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

352.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

353.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the

Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from

any party with whom they have privity of contract. Defendants have paid no consideration to any

other person for any of the unlawful benefits they received indirectly from Plaintiffs and the

Damages Class with respect to Defendants' sales of Econazole.  It would be futile for Plaintiffs

and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the

Damages Class have privity of contract because Plaintiffs and the Damages Class did not

purchase Econazole directly from any Defendant.

**Texas**

354.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Econazole in Texas at prices that were more than they would have been but

for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages

Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted

from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of

or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The

circumstances under which Defendants have retained the benefits bestowed upon them by

Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful

overcharges for Econazole.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

355.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Econazole in Utah at prices that were more than they would have been but

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Vermont

356.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Virginia

357.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Econazole.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

358.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**West Virginia**

359.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Wisconsin**

360.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

361.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**U.S. Virgin Islands**

362.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Econazole in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Econazole, which revenue resulted from anticompetitive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.

Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.

Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It

is against equity and good conscience for Defendants to be permitted to retain the revenue

resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at

law.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.      The Court determine that this action may be maintained as a class action under

Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable

Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be

given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be

adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections

1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an

unlawful combination, trust, agreement, understanding and/or concert of action in violation of

the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum

extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of

the Damages Class be entered against Defendants jointly and severally in an amount to be

trebled to the extent such laws permit;

178

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XVI.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


April 1, 2019                                        Respectfully submitted,

                                                     Roberta D. Liebenberg, Esquire
                                                     Fine, Kaplan and Black, R.P.C.
                                                     One South Broad Street, 23rd Floor
                                                     Philadelphia, PA  19107
                                                     (215) 567-6565
                                                     rliebenberg@finekaplan.com

                                                     **Lead Counsel for the End-Payer Plaintiffs**


Gregory S. Asciolla, Esquire              Michael M. Buchman, Esquire
Labaton Sucharow LLP                      Motley Rice LLC
140 Broadway                              600 Third Avenue, Suite 2101
New York, NY  10005                       New York, NY  10016
(212) 907-0700                            (212) 577-0040
gasciolla@labaton.com                     mbuchman@motleyrice.com


Elizabeth J. Cabraser, Esquire            James R. Dugan, II, Esquire
Lieff, Cabraser, Heimann & Bernstein, LLP The Dugan Law Firm, APLC
275 Battery Street, 29th Floor            365 Canal Street, Suite 1000
San Francisco, CA  94111-3339             New Orleans, LA 70130
(415) 956-1000                            (504) 648-0180
ecabraser@lchb.com                        jdugan@dugan-lawfirm.com


Jayne A. Goldstein, Esquire               Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP     Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320       1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326                 Philadelphia, PA  19103
(954) 515-0123                            (267) 519-8306 (Office)
jgoldstein@sfmslaw.com                    mreuben@litedepalma.com

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Ave South, Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

**End-Payer Plaintiffs' Steering Committee**

Audrey A. Browne, Esquire
    American Federation of State, County
    and Municipal Employees District
    Council 37 Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American
Federation of State, County and
Municipal Employees District
Council 37 Health & Security Plan**

Jeffrey B. Gittleman, Esquire
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600
jgittleman@barrack.com

Peter Safirstein, Esquire
Safirstein Metcalf LLP
350 Fifth Avenue, 59th Floor
New York, NY 10118
(212) 201-2845
psafirstein@safirsteinmetcalf.com

**Additional End-Payer Plaintiffs' Counsel**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Second

Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will

electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing will be

served on all interested parties registered for electronic filing and be available for viewing and

downloading from the Court's ECF system.


Roberta D. Liebenberg